May it please the court, my name is Tim Green and I'm the attorney for the appellant John K Reynolds and I'd like to reserve two minutes for rebuttal. Good luck. Thank you. Mr. Reynolds at the time of the litigation two years ago was a 48 year old man incarcerated in the state penitentiary system for first degree robbery. He has 171 months to serve. He's at this point he probably has between four to five years to go. What we were contending on our petition for our appeal is that this case should not have been denied on a summary judgment motion in the district court because there are issues of fact relating to what we allege to be the deliberate indifference of the treatment provider. Mr. Green, let me focus on what troubles me in this case. You're not making an allegation that Mr. Reynolds wasn't afforded access to medical personnel. In other words, the record's pretty clear. He sees the nurse provider quite regularly. Your central claim seems to be as to the extent to which he was given. And the diagnostic methods that might have been used. So let's assume that all of that fell below the standard of care. I'm just focusing on the malpractice claim for a second, which may be a little easier for you. What's the evidence that your client was injured? In other words, there's nothing in this record that tells me that if he had an MRI or if they had an MRI, he would be better off. And whether it were under 1983 or a Med-Mal statute, put aside your absence of expert testimony, there has to be some evidence that your client was harmed by this course of conduct. What's the evidence of that? Well, it's the – if you look at the offender health plan, it states that – They may not have followed the plan. I'm giving you all this stuff. Okay. It's malpractice. They fell below the standard of care. Any good doctor would have ordered an MRI. Okay. Fair enough. What – but you've got to show that you were harmed by that failure. So tell me what evidence there is that your client was harmed by these alleged misdeeds. Well, the problem that we have is because there wasn't anything done besides just giving him the palliative drugs, we don't know. But don't you have – Did he say he got worse? Pardon? Does he say he got worse? He did get worse. But can you – do you have any evidence that a different treatment plan would have prevented him from getting worse? You know, what you say is the prison didn't give you that evidence, and I understand it. Right, right. And that's the thing. He was having worse problems. He couldn't put his – He was also – he's also lifting weights and doing other things, too. So, I mean, we can't – what I'm having difficulty – if you had a doctor here that said if this guy had gotten an MRI, he would have had this treatment plan and he would have – the pain would have been ameliorated, I'd agree that summary judgment was inappropriate. But what I'm hung up on is damages. Well, the – I guess I – it's – I guess your position has to be that since he got worse, that's enough. At this point, yeah. At this point, yes. I guess that's all. What's the evidence that he got worse? Pardon? What's the evidence that he got worse? Well, it's his own description of what he was able to do and not able to do. I know, but then the people come and they say they saw him lift 250 pounds and win a contest. Right about at the same time, he said he can't do anything. He quit exercising in 2015. He said he was no longer able to do it. I know, but in 2013 and 14, he was also saying he couldn't do anything. Pardon? But he was also saying he couldn't do anything earlier than that. Well, he wasn't saying he couldn't do anything. He was just saying it was getting worse. Oh, he said it was excruciating pain. Let me ask you, how do we hold a nurse accountable for anything in the parlance of deliberate indifference? I mean, she did what her position called for. She examined him. She assessed his range of motion. She had an X-ray. She had the X-ray read. And when he complained of continuing and persistent pain, she did what she was supposed to do. She referred his request for an MRI to the committee. She didn't deny that. The committee did. How do you hold her accountable or responsible, much less find in deliberate indifference on her part? Well, my understanding is that she never made a recommendation that perhaps he should get some additional... But she did ask licensed physicians. She sent it up to licensed physicians and said... Well, he... Well, but it was sent up to licensed physicians who looked at it and said, we think he wants an MRI. We don't think it's medically indicated. So under those circumstances, how was the nurse... She couldn't order an MRI, could she? She could recommend one. But she already knew what the outcome of the recommendation would be because the doctors had said, no, we don't think one is necessary. Well, I'm sure that her input was considered by the... No, and again, I'm assuming maybe she fell below the standard of care, but how is that deliberate indifference? And I'm not... My understanding is she didn't send this up to the committee. It was my client who filed the grievance against her. He has the right to ask that it be reviewed, but she knew it had been reviewed by physicians who had agreed with her course of action. Well, that's one reason why I've also included the physician as a defendant. And I just want to go back to something that, Your Honor, that you brought up earlier. I do have to be candid with the court. I should have, when I filed the complaint, said damages and injunctive relief because... And I didn't. And that was... Well, but to get injunctive relief, you still have to show harm. Well, that's true, but at least that's closer to what we were asking for because what we were asking for is the diagnostics that we anticipated would have shown the damages. On the injunctive relief side, you think we should order the Washington Department of Corrections to conduct an MRI? Look... I mean, that's injunctive relief, right? Well, the court... Not you, but it should be remanded back to the district court and have the district court do that. We merry band of Article III judges. Pardon? We Article III judges, one of us, should order the department to... I wouldn't... I would just anticipate a remand to have... Okay, but what you want the district court to do is order an MRI, correct? Yes, that would be... You say you didn't ask for injunctive relief. Right, right. Reading your complaint broadly and seeking it, that's what you'd like them to do. Right. Or in the course of preparing for trial, counsel and I come to an agreement that that would be the appropriate solution. Oh, you'd like to settle. I understand. Yes, yes. And that was the thing. The case was... Before we started... And I have no complaints about that. That's life. But it was started very early before we actually got into the discovery process and that type of thing. But it's... The problem that I see is that there would never... The federal health plan, and I'm sure the nurse knows about that, states that if there's intractable pain, which is constant pain, getting worse, interfering with daily activities, that if conservative treatment doesn't work, medication doesn't work, then other types of treatment should be looked at, including physical therapy. Do you have any... You have an expert who even explains why an MRI would find anything that wasn't on the X-ray that might be relevant. Right. I mean, apparently the X-ray after he fell was completely normal and showed no signs of any acute fracture, subluxation, whatever that is, erosion or sclerosis. So the question is, is there anything that an MRI would show, because that's all he really wants, could show that would either contradict that or would show something else that was relevant. We have no reason to think that. Well, an MRI was one thing we were looking at. What my client wanted, first of all, was just a consultation with a doctor, actually to talk to a doctor. Well, he essentially had that, I mean, in the sense that he had doctors who went over the records in some detail. They went over the records, but they never actually had a face-to-face. But it seems like the main thing he wanted was an MRI, and I would be a lot more able to deal with this case if I had any idea why an MRI would make any difference. And I agree. And we did make a motion to give us more time to get an expert. Unfortunately, that wasn't . . . Okay, well, if you want to save any time, you should do it now. Oh, okay. Thank you. All right, thank you. Good morning, Your Honors. May it please the Court, my name is Mike Throgmorton. I'm an Assistant Attorney General here on behalf of the Respondent, Department of Corrections, and Mary Kepler. As we notified the Court just recently, we recently learned that Dr. Loren has passed away. We have contacted his widow, and I have secured her approval to represent his . . . his estate has not been probated. All of his assets were put into a family trust, and I can represent today that I do represent the interests of that trust when and if they are substituted in this case. I'm here today asking the Court to affirm the District Court's granted summary judgment on Mr. Reynolds' claims for two reasons. First, he presented no evidence in support of his claim that the treatment that he did receive, which the Court described as X-rays, serum testing, medication, and regular checkups, was so deficient as to be a constitutional violation under the Eighth Amendment. And secondly, he points to no case law that clearly established his right to receive the treatment and diagnostic procedures of his choice. Let's assume you're right about all this. Let me tell you what typically troubles me about these cases, both at the trial court level and here. You both have spent thousands and thousands of dollars to litigate this issue, and the consultation would have cost $300 and the MRI would have cost $1,000. Is there any thought in these cases given to simply, at an early stage, saying, gee, if we could settle this by having a neurologist come in and look at him, why don't we do that other than litigating that up through the Ninth Circuit? Well, for starters, I work pretty cheap, Your Honor. Yeah, I know. And that's part of the problem, which is that State Departments of Corrections have free lawyers, and so they don't do the calculation that everybody in the rest of the world does and says, well, my lawyer costs $200 an hour and I can get the neurologist in for $200 an hour and settle the case. $200 a case, actually, if I'm in state court. I take your point that you're underpaid. And I know you can't respond to this. I'm just exercising some frustration because we've got three people here and a district judge and a whole bunch of lawyers in a case in which my guess is a mediator could settle in five minutes if a neurologist came in and looked at Mr. Reynolds, but that's not what's in front of us. So I've vented. Well, I wanted to respond to your observation earlier where you pointed out that even if we assume medical negligence, and that's the term under Washington state law for medical malpractice, that doesn't state a claim under the Eighth Amendment for deliberate indifference. Deliberate indifference is over and above that. Deliberate indifference requires a showing that prison officials had a culpable state of mind that they were actually aware of facts from which they could draw an inference that a substantial risk of harm existed, that they actually drew that inference and that they nevertheless disregarded that risk of harm to the plaintiff. In your mind, in the continuum of events, could you foresee a situation where a prisoner with complaints of persistent and worsening pain over an expanded period of time might trigger responsibility, the failure of which could amount to deliberate indifference? I think that's a pretty fact-specific analysis. If, for example... So that's a yes, then? Sure. I could come up with a scenario where, you know, let's say in this case if his X-ray had showed a giant tumor pushing on his spine and they said, gee, that looks awful bad and sent him back to his cell and did absolutely nothing. Oh, it doesn't have to be that bad. That wasn't my hypothetical, but okay. That's my concern. You always change the hypotheticals. So what if Mr Reynolds keeps coming back year after year and saying this course of treatment's not working? It's getting worse and worse and worse and worse. And everybody keeps saying, well, we took an X-ray 4, 6, 8, 10 years ago and it was normal, and so take the drugs and shut up. At some point, that's not this case. But that's what Judge Durie was asking you and then you changed it to a misdiagnosis at the beginning. Under that set of facts, would we have deliberate indifference? The touchstone of deliberate indifference really is a lack of treatment. It's difficult for me to say because in this case what we have... Withholding of treatment, lack of treatment, withholding of treatment. I think you've answered the question. Go ahead. I mean, what we have in this case is a difference of opinion between an inmate and his providers as to the propriety of the treatment. And under Estelle v. Gamble... The problem is here that it isn't really treatment. It's diagnosis. The reason why we have a black hole is because the problem isn't that they knew what was wrong with him and made a judgment about what his treatment should be. The problem, he believes, is that they didn't do sufficient diagnosis to find out what was wrong with him. Well, I think that's partially true. He did receive treatment in the form of medication, so they didn't just ignore him. They did treat his pain with pain medication. But then they accused him of seeking drugs and he says, I don't want drugs, I want a diagnosis so I can get fixed. I actually don't want the drugs. That's the whole point. Well, he says that now. If you look at page 70 of the record, you will find that when he visited Nurse Kepler on November 27, 2012, he told her that opiates helped while in jail and he wanted them now so that he could do his exercises better. That's because they weren't doing anything else. Well, they did do other things. They gave him x-rays, they gave him serum testing, they gave him regular check-ups 20 times which included a neurological component. An MRI, for example, is not the first in-line treatment for back pain. If you or I were to go to our doctors, they would have done the exact same thing. They would have said, do you have any neurological deficits? If you have neurological deficits in a dermatomal pattern that makes sense based on what we know about human physiology, then maybe we'll order an MRI. That's not this case. This case is an inmate who's garnering podium finishes in prison weightlifting competitions while he was complaining about not being able to put on his shoes and socks. The providers in this case looked at the... Well, those things are simultaneous. I've looked at the days actually and it seems to me that the declaration that he signed that said that was in 2016 and he said then that he couldn't put on his shoes and socks now and he said he stopped exercising in 2015 and I didn't see anything to contradict that as far as I can tell, the last weight contest was in 2014. Is that wrong? The last weightlifting contest that he competed in was in 2014. That's correct. I've got a question about the record. I can't tell whether or not the MRIs that were taken on a previous occasion... The 2007 ones? Right. Were they available to... I don't know the answer to that question. The record's ambiguous on that. The record reflects the fact that an MRI occurred following a previous injury in 2007. That was before he fell the second time, right? Yeah, that was back in 2007. I don't know whether the physician or the nurse actually had access to those. They knew they had occurred. Did they have access to them? I don't know the answer to that. I do know that Mary Kepler's chart notes, which are in the record in pages 60 to 68, indicated that she ordered his full record. No, I understand that. I don't know if that was in those records. I'm trying to figure out whether there's some other link that says, and in the full record were the MRIs. You can't answer that. Now, did he file grievances... When was the last grievance he filed? The last grievance that he filed was... Denied on 2014? December of 2014. Essentially, it was while he was still doing the weightlifting and before he says he couldn't put his shoes on. Yes. And I stress that those complaints that he was having trouble doing activities of daily living, those post-date his final trip to seek treatment for his back. So those are complaints that were never presented to the Department of Corrections. So the complaints that we deal with are the ones that were grieved? Yes, because under deliberate indifference, the analysis is... Or you have to administratively exhaust the otherwise. Correct. And at that point, he was winning weightlifting contests. Yes. Well, with that, I'm happy to answer any other questions that the panel has. Otherwise, I'm happy to yield the remainder of my time. Thank you very much. A minute of rebuttal, which is a little more than you had left. All right. Thank you. Okay. I believe I have 2 minutes. What about this last problem? The way the dates add up as I see it, is that at the time he filed his last grievance, he was still lifting weights, and 2 months later, he won a weightlifting contest. Well, he... The 2016 declaration goes to his situation in 2016, but it doesn't go to his declaration at his situation at the time that is relevant to us. In fact, his suit was filed in 2015. Right, right. And he should have... I know it's not a part of the record, but for what it's worth, I did talk to him about that, and he just said, well, I can't get along with that nurse, so I didn't communicate with her again. Anyway, it's a big problem in the sense that it sounds like maybe he has a problem now, but he didn't have a problem then. And I understand what you're saying, but it's indicative of the continuum of what was going on that he felt himself getting worse and worse, that there was more pain, and then it got to the point where it was totally interfering with his activities. Even when he was lifting weights, he expressed there was difficulty because he had pain from the very start. But it indicates... The fact that he couldn't put his shoes on in 2015 indicates there was a continuum there. Okay, thank you very much. Thank you both for your arguments. The case of Reynolds v. State of Washington Department of Corrections is submitted.
judges: Berzon, Hurwitz, Dearie